Good afternoon. Illinois Appellate Court First District Court is now in session. The First Division, the Honorable Justice Carl Anthony Walker presiding, case number 17-2090, People v. Jason Conway. Good afternoon, everybody. I'm Justice Walker, and I have here with me Justice Hyman and Justice Pierce, and I'd like to start by having each of you to introduce yourselves, the attorneys who'll be arguing the case. Sure. Thank you, Your Honor. I'm Gavin Dowe. I represent the Appellate Jason Conway. Okay. Thank you, Mr. Dowe. Good afternoon, Your Honors. David Iskowich. I'm with the Cook County State's Attorney's Office on behalf of the people. Okay. And thank you, Mr. Iskowich. And I need to know how much time will you need, Mr. Dowe? I would be asking for 15 minutes and then five for rebuttal, please. Okay. And Mr. Iskowich, how much time do you need? Oh, 15 minutes should be adequate. Okay. All right. And if for some reason you run out of time because we're asking you questions and you have a really important point that you wanted to get to, let us know, and we'll give you a minute or two to sum that point up once we're done asking questions. So with that, Mr. Dowe, we'll start with you. Thank you, Your Honor. Good afternoon. May it please the court. As I'm sure you're all aware, there are four issues in this case. I'm intending to address the first two of those issues in my argument. That would be the sufficiency of the evidence as well as the Confrontation Clause issue. But I am, of course, ready and happy to answer any questions the court might have about the other two issues. Starting with the sufficiency of the evidence, the state's case rises and falls with the identification and testimony of officer story. And under the law, an eyewitness identification is only reliable enough to witness has a full and adequate opportunity to observe the suspect. Now, in this case, officer story testified that he was approximately 150 feet away when he identified the shooter as my client. Well, he 10 minutes later, he identified my client, but when he saw the shooter's face and was able to make an identification later based on that face, but purely as a matter of common sense, 150 feet is too far to make up the fine make out the fine facial details you need to be able to make that kind of identification down the line. The officer story even testify to any facial features. Officer story testified that he saw the front and left side of the shooter's face, and he did not give any details about the facial features. Well, that's what I mean. I mean, just because you see a side of a face, that doesn't mean that you can identify the person. And we're talking about how many seconds here. We're talking about enough time to watch as the shooter fired several shots and then went into and out of a car twice. So there are several seconds that we're talking here. But I think you're right, Your Honor. Officer story didn't identify any facial features, and that's because he couldn't. Wait a minute. Wait a minute. Why do you say he couldn't? Did anybody ask him for facial features? No, Justice Pierce. I say he couldn't. So that's what we have. We have a police officer who said he saw him, and this is the person he saw. The fact that he didn't describe any facial features or bodily measurements, he wasn't asked, right? That's correct, Your Honor. Okay. I think that the absence of a description isn't what our case relies on. Our case relies on the common sense proposition that at 150 feet, you can't make that identification reliably. The things that you can make out... Yeah, why do you... Because the distance involved, Your Honor. But did you have expert testimony to that effect? No, there was no expert testimony to that effect, Your Honor. So that's just your conclusion based on your experiences in life? It is a common sense conclusion. Now, it is a common sense conclusion that's backed up by scientific studies, which we do cite in our brief. But they were not presented to the trial court? No, Your Honor, but they didn't need to be presented to the trial court. Because what this court's task is to decide the legal question of whether a rational judge or jury could, based on the evidence that was presented, find beyond a reasonable doubt that the shooter was my client. And the point of citing those studies is just to... It's no different than... You can consider your common sense when you are deciding whether the evidence is sufficient. And the reason we cited the studies was just to back that up, to back up that common sense notion. It's like what the U.S. Supreme Court did in the Roper, Graham, and Miller line of cases with brain science involving juveniles. That's not... Those aren't things that were presented to the trial court necessarily in those cases, but those were just general facts that were known to the reviewing court and that aided the reviewing court in making the determinations it did in those cases. Now, at the distances involved here... You don't have any cases that say 150 feet is too long to observe and identify somebody's... Well, the Hernandez case that we cited in, I believe, the opening brief held that a glimpse of a suspect's profile at 90 feet, substantially reduced distance from the distance in this case, was not reliable enough to sustain a conviction. That's a glance and you said here there were several seconds. Yes, that's correct, Your Honor. So that is one... That is a distinction, but the difference... The distances here are also longer. Well, I mean, you have two factors there, distance and time. Yes, of course. So why should, in this situation, where there's more time, why wouldn't that be an ample opportunity to observe as required by the cases? Because an ample opportunity to observe requires more than time. Normally, we see things like, does the person have a clear view? But when we're talking about distance, and you know, this isn't a case where the officer had binoculars or anything like that. This is purely with the naked eye. And distance changes your opportunity to view somebody. If someone's 1000 feet away, you can't hope to identify them. And by anything, you won't be able to tell anything about them. When you get to distance about 150 feet, common sense tells you that you can't see their face. The things that you can see are the sort of broad features, like what kind of clothing are they wearing? How do they, you might be able to tell how they move if they have a distinctive move. So we're just to give a, what we're talking about is a football field in a half, right? A half a football field. I thought football pit field was 100. 150 yards. 50 yards. That's why I don't play football. It's 100 yards. It's 100 yards. No, no, no, it's not. 150 feet divided by three feet is 50. Right. I know. I was saying that a football field is 100 yards. Oh, yeah. Yeah. So it's a half a football field. I'm just trying to get, I want to see what this, we're going to imagine that we're talking half a football field. Well, here, let me give you this for the benefit of everybody. It's five city lots, five houses away. Chicago lots are 25 feet wide. So if one were standing in front of one house, five houses away would be the person this officer saw. No, that would be six, Justice Pierce. He'd be at the sixth house, but he'd be five houses from him. Justice Walker. Anyway. I think we should stick to the football field. I agree. Half a football field is what we have been saying the whole time. So I think we will stick with that. Now, apart from the identification, I just want to point out there's really not that much in this case. My client was found in the building that the shooter ran into, but no one watched the back door. There were 10 minutes in which the shooter could have escaped out the back door. There were other possible suspects in the building. It wasn't like my client was alone in there. But he was found near the coat. Well, the sweatshirt was found on the floor next to him when he was sitting down there and the officers came in. Right. It was right there. The gun was in a different part in the basement, different part of the building. The gun was in a separate unit, actually. So it wasn't merely a different part of the same home. It was a separate unit. And that means that either the shooter or somebody connected with the shooter took the gun down there. So that was a separate apartment, not a basement? That was a separate apartment? Officer Story's testimony was that it was a separate unit. Okay. Unless the court has more questions about the sufficiency of the evidence, I'd like to use remaining time I have to discuss the confrontation issue in the case. Sure. You may proceed. Thank you, Your Honor. We just touched on the sweatshirt. And the sweatshirt is the key to this confrontation issue because it was used to try to tie my client to the shooting. They did a gunshot residue analysis of the sweatshirt. They found gunshot residue on it. But the problem is that that testimony about the GSR testing didn't come in through the analyst who actually did the testing. It came in through a surrogate expert. And I don't think that that's a particularly controversial proposition because we didn't have the original examiner testify. We had a witness come in and say, here is what the original examiner found. And I then reviewed that person's report notes. But the state's expert didn't actually perform the tests himself or observe the test being performed himself. So we do have a surrogate expert. And the real question is whether or not that's a problem under the Crawford line of cases under the confrontation clause. So the question is, is the underlying report here that was testified to, is that testimonial? The answer to that question is found by looking at the splintered opinions in Williams versus Illinois. There are essentially three tests that came out of that decision. I'm sorry, did one of you have a question? No, I must have misheard. I apologize. I'm hearing nickel also. I thought it was maybe that someone was recording or that you had something in the background or maybe Mr. Skolick has something in the background because I didn't hear this during our previous argument. So it's not the judges, but someone has something going in the background that's causing a problem. It may be my computer. When I get an email into my system and I don't know how to turn that off. So I apologize. Yeah. Mine does the same thing just as peers. I think what I'm hearing is almost like a radio in the background, but it's, but you can continue. We'll, we'll ignore it. Thank you, your honor. As I was saying, there were three tests that came out of the Williams decision. Two of those tests, the targeted individual test and the providing evidence test would say that the report in this case is testimonial. It's testimonial under the pluralities test because it was prepared for the primary purpose of providing evidence against a and then under the distance test, it was testimonial because it was prepared with the primary purpose of simply providing evidence for use in a future trial. That makes up eight of the nine justices in Williams. And based on how the Illinois Supreme court has approached interpreting Williams and Leach and, and Barner, that means that the lab report in this case was testimonial, even though it was not formal. Was there an objection to that testimony? No, there was not your honor. So we are arguing that that it was plain error under both prongs. First under the closely balanced evidence prong. It's essentially the same argument as the sufficiency argument. We do have a questionable identification here. Even if you find that the evidence was sufficient, we still have a pretty long distance. And we have situation where a lot of triers of the fact wouldn't, wouldn't have found guilt, I think. And so the evidence is closely balanced. We also have second prong plain error here. And that's under under the Lucas case, which reviewed a confrontation violation under the second prong. And if there are no further questions, I would reserve the remainder of my time for rebuttal. Thank you, Mr. Dow and Mr. Eskowitz. Thank you, your honors. Again, may it please the court, Mr. Dow. On the sufficiency question, this case boiled down to a single eyewitness identification that was bolstered by corroborating evidence that when viewed in the same way, favorable to the prosecution, established beyond a reasonable doubt that the defendant was the shooter. Now, I understand the defendant wants to focus solely on the identification by officer Dow. I'm sorry, officer story. No, Mr. Eskowitz, you just mentioned that, Mr. Eskowitz, you mentioned that again. And then you mentioned that in your brief, you said that the trier of fact is to receive the evidence in a light, light, most favorable to the prosecution. Oh, no, sir. Not the trier of fact. I didn't mean that. Yeah, I think you said that in your brief. I'm sorry. I did. Okay, you're referring to the trier of fact. Okay, thank you. Of course, I knew the rule, your honor. So this court reviews the evidence in a light, most favorable to the prosecution. And that evidence in this case consisted of an eyewitness identification by officer story that was followed up by a series of physical evidence and his observations that would lead to any rational trier of fact. The physical identification, that was what we were talking about before. Yes, your honor. The basis was looking from 150 feet away in some seconds, I don't know how many, but a somebody in identifying them based upon what? Sure, your honor, two items of clothing, light colored jeans, and a multicolored, unique looking sweatshirt, which the prosecutor emphasized during his closing, was unique in that nine out of 10 hoodies that are worn by anybody in this country are probably black or dark color. This was multicolored. Just to put this identification a little more context for you as well, your honor, officer story was specifically sitting in his squad car as part of a surveillance team. This was literally his job, was to watch and observe in his position as a surveillance officer, the goings on in this neighborhood. So the judge did take that into consideration as well, that this wasn't a random passerby who just happened to glance up and see a crime being committed, but this was an officer and eyewitness who testified that he was there for the very reason that he was eventually called in to testify, which was to watch for criminal activity. Did he testify to any training that he received, specific training with regard to identification? He did not, your honor. In his finding, the trial judge emphasized that he wasn't making a credibility determination with respect to stories identification based on his general employment as a police officer or his training in surveillance techniques. But the more specific narrow fact that he was at that time and at that moment doing exactly what a person would be doing, who's paying attention to the situation, which is acting as a person surveilling a neighborhood. After he saw the shooting, he made specific observations of the defendant approaching a black Pontiac vehicle. I think he approached it once and he backed off. Then he approached it twice as if he was trying to get something out of the car and then run into the apartment, which was about two houses down from the corner where he was parked. Upon entering that, he saw immediately the multicolored sweatshirt on the floor. He noticed that the defendant was wearing the same light-colored jeans and a search of the basement apartment. And I believe it was a separate basement unit apartment. Justice Walker, I think you had asked that. The two firearms were found, one of which had been recently fired with 40 caliber bullets, the shells of which were found on the sidewalk outside of the scene of the shooting. There also was gunshot residue discovered on the sweatshirt. Not on the defendant's hands. So that gunshot residue testing ended up being somewhat of a wash for purposes of the evidence. But the court mentioned it in about two lines of his six-page finding verdict. As far as the distance is concerned, there is 150 feet or half of a football field. I know my able opponent was discussing common sense. I don't know if that is a term that we can quantify in terms of a case like this. As the court knows, sufficiency challenges and identifications especially are assessed on a case-by-case basis. And in this case, the identification, while from 150 feet, was supported by other facts, not only in Officer Story's testimony, but by the stuff that he found in the apartment in a situation there that should have led any rational trier fact to conclude that the defendant was the person who fired the pistol and was properly found guilty of being an armed individual criminal. About the GSR testing. The court is right that this is forfeited. The defendant neither objected to the testimonies that came in, nor did he include the error in post-trial motion. I would also note, and I know I'm at risk for doing this, but we should have also argued that the issue was waived affirmatively because defendant's attorney affirmatively acquiesced in the eyewitnesses' testimony as an expert on the gunshot residue. I know we didn't include that in our brief, so that argument is waived. But it would be a much more efficient way to dispose of the matter if the court were and excuse the waiver of the waiver. On the forfeiture, we have plain error. As far as the closeness of the evidence is concerned, Your Honors, I outlined, I hope in enough detail, the scope and quality of the evidence to uphold the conviction here. I've seen cases with more eyewitnesses, with more evidence, but that's not the question. The question is whether on this record, the evidence was close. We submit that it was not. And therefore, he fails the first prong, plain error. As far as the second prong is concerned, my opponent cites to the Lucas case, which is an Illinois Supreme Court case, I believe from 1992, which mentions in very brief passing that they would review a forfeited confrontation clause issue under the second prong. There was no further discussion or evaluation, Your Honors, about that. More recent case law from this court in particular has reaffirmed that because confrontation clause errors are subject to harmless error review, it logically follows that they are not the kind of errors that are so structurally significant that they could compromise the integrity of a person's trial. If the court were to review the merits of the issue or determine whether or not there was error in the first place, our position is that there was not. And the U.S. Supreme Court, beginning with Crawford, has been, in a series of decisions, of splint, very splintered decisions, have opined on the admissibility of forensic reports. I think that, and I know I'm swimming a bit upstream here because I know that this court and Justice Pierce in particular has, in the Lucas case, has, on very similar facts, decided that this is a confrontation clause violation. I would suggest that the court would look at the spectrum of confrontation clause errors with respect to forensic reports with, on one hand, the Bullcumming case and, on the other hand, the Williams case. In Bullcumming, an actual physical report concerning blood alcohol content was tendered and entered into evidence. The person who testified about that had absolutely nothing to do with the testing or the composition of the report, but was merely acting as a surrogate. Because that evidence formed the central core of the state's case against the defendant in an alcohol case, the court found that he had the right to confront the person who had composed the report and that its admission as substantive evidence for the truth of the matter asserted was confrontation clause error. Williams is on the other side of the spectrum, or at least a little further along the spectrum, and Williams found on these facts no physical report was tendered. There was nothing admitted as an exhibit into evidence. The person who testified about the evidence, about the cell mark DNA report, was not using the prior cell mark testing as substantive evidence, but was only testifying to that as forming the basis of her expert opinion that the DNA matched. And I know that in the Lucas case, this court, at the very end of the opinion, discussed how the basis of opinion hearsay issue wasn't addressed or was under-addressed or didn't apply. I'd ask that this court take a look at the Williams case in light of that rule, in light of the basis of opinion rule that such testimony is not, in fact, hearsay. And I'm speaking in circles here, but to circle back to this case, the testimony that the defendant is complaining about is certain GSR report analysis that were composed by an expert lab person who had retired by the time the case was called to trial. It's clear from this witness's testimony, and the trial court took note of this as well, and this is at page 131 of the record, the trial court asked this expert, Mr. Rokowitz, are you testifying that you're just reasserting what the previous expert found? And he denied that and said that his opinion on the presence of gunshot residue was his own opinion based upon his own assessment of what the prior expert had determined. Under rule 703, Illinois rule of evidence 703, this was a classic case of basis of opinion testimony that was not offered for the truth of the matter asserted. Therefore, when Rokowitz testified that he had used that previous report as a basis for his own testimony, the defendant was not entitled to confront him or any other witness with that basis of testimony, because it was not offered for the truth of the matter asserted. One other point on that is that the sweatshirt... Let me interrupt you because I'm not going to be able to remember this. Okay, your honor. What was not offered for the truth of the matter? Okay. The report that was composed by the first lab analyst, Mr. Burke. So he didn't offer that in the evidence? No, your honor, nothing was offered in the evidence. That was another distinction between our case and Bull Cumming. And it was a real important fact that drove the analysis in Williams, was that there was never anything admitted into evidence in Williams either. It was just testimony. And what I mean admitted, what I mean is a physical, actual piece of paper that was certified. You're saying that this witness's testimony was his own expert opinion formulated upon his review of the retired experts analysis? That's correct, your honor. You're saying that then goes to the weight of the testifying witnesses' testimony? Correct, your honor. It's up to the trier factor at that point to determine whether that basis is, you know, that explains the background for his arrival at that opinion. And this is something... His opinion was offered for the truth of the matter? Of course, your honor. But he was able to cross-examine too. Yeah, okay. Thank you. You're welcome. But you agree that if you find that there is a confrontation clause issue, then there's no issue with waiver, correct? Well, I mean, the court, we've waived the waiver. So if the court decides to enforce it, that would be great. But we obviously recognize we don't have that argument or brief, and so it is waived. We have the forfeiture, and the court would have to find, in order to grant relief on this claim, not only that there was an error under the confrontation clause, but also that one of the two prongs of the plain error inquiry apply, that the evidence was either closely balanced or the error was so awful and structural that it compromised Mr. Conway's right to a fair trial. And we submit that not only was there no error, but even if there was, neither of those prongs are satisfied. And as far as the waiver is concerned, that's an argument I'm making today for the first time as another basis that the court might want to consider in resolving the matter. And let's just jump back a minute to the judge's finding that the, it appears that the judge had found that the police officer was more credible simply because he was a police officer. Do you want to respond? Sure, your honor. I think that the trial judge's much more nuanced and narrow. He didn't find that he was more credible because he was a police officer. And he said that. He said, I'm finding him credible because as a police officer, he was there in his job that day, was it to watch for people, watch for crime, to surveil the area. And because he was there in that role, and doing what he was supposed to be doing, and doing exactly what he was assigned to do and do what he testified to when he came in, that enhanced his credibility because he was literally, it was his job that day was to watch. I'm reading from the transcript. He says he is a law enforcement official, which I think is something that I can take into consideration as compared to an individual who never had any such training and the dangers of false identification become more concerning than with a police officer. That is not a general statement that is specifically to this officer. I believe his testimony is clear, credible, and convincing with regard to this. Right, your honor. I think the qualifying language there is, this is not a general finding as to very job is to watch, and look, and observe, and remember, and take notes of things that civilians might not as an officer on a surveillance routine. I would ask that the court take a look at the judge's finding and verdict in that respect, not as a general proposition that more police but that in this case, Officer Story's job as a surveillance officer was to watch. The judge seemed to have failed to realize that he's still testifying as a witness, who happens to be a police officer. Therefore, he doesn't get more credibility just because his job is to do surveillance, or his job is to arrest people, or his job is to do whatever. You don't get more credibility because of your job. It could be a judge testifying, the judge doesn't get more credibility because he's a judge. I agree, your honor. I think that therein lies the problem with this case. Okay. If I could just maybe assuage your concerns, I think that the judge, again, wasn't qualifying the officer's overall credibility on his role as a police officer, but in his role that day as an officer on a surveillance detail. And that because he was there to observe, to take note of things, to look at people, to look out for crime, and he had a bead on the defendant from the minute he opened fire until he ran into the house, his opinion was credible. I understand your honor's concerns though, I do. And I don't think it would be proper for any judge to find that because a witness is a police officer, he is therefore more credible because if he's a police officer. I think this case is the finding by the judge is a bit narrower. And he found that because the officer's story was on surveillance, and they're watching and observing as his job was that day, his opinion was credible. And that is has to be taken into consideration with the, not only the evidence that was in the home, but also his identification of the light colored pants and multicolored sweatshirt from that distance that matched the items that the defendant was wearing or was nearby in the home. Okay. Was there anything further? You're out of time. I'm out of time, your honors. Thank you very much for your consideration today. And thank you. We would just ask that the court affirmed the judgment. Thank you. Thank you, Mr. Squidge and Mr. Depp. Thank you, your honor. Starting with the trial court's findings, I just have two points to make about that. The first thing is the trial court found that he was more credible due to the officer was more credible due to his training. There was no evidence of train. And I just need to, I want to be clear about that, that the trial court's finding didn't have evidentiary backing. The trial court didn't say, well, he was a surveillance officer. So I think that he was watching more closely. The trial court said that he had training. He did not have training. The second point I wanted to make about that was just to clarify what the officer was doing at the corner while he was part of a surveillance team that day, he was not doing active surveillance. He had been doing active surveillance elsewhere, and he had relocated because some people had approached him. So there was no testimony that he was doing active surveillance at the moment that this happened. Turning to confrontation. I don't think that we have a situation of true waiver or invited error here. And there are two reasons for that. If you look at pages 123 and 24 of the transcript, what you'll see is that the defense stipulated to the fact that the witness was an expert in this particular field. And there's no dispute about that. He certainly worked at the laboratory where the test was done. And there's no reason to think that he wasn't an expert in that particular field. But the problem is that he didn't. The problem we're arguing here in appeal is that he wasn't the one who did the testing. So he can be an expert in in this field. But that doesn't mean that he's the one who did the testing. And it doesn't mean the defense agreed that he was the one who did the testing. Well, what is it that you're saying you you were deprived your right confront? We deprived the right to confront the analyst who did the tests, who wrote the report, upon which everything that Rokovic did was based. But if any expert who testifies, who says I, I'm relying on my reading of Hyman and evidence. And that's the basis of my opinion. You know, it's not a confrontation clause violation, because the author of Hyman on evidence wasn't in court. As I understand it, this this testifying witness said, in my opinion, residue was on the sweater. And I'm basing that opinion on my report, and my reading of the report done by the retired forensic analyst. So it wasn't the report that was in evidence, it was the opinion of the testifying witness who was subject to cross examination. Where is the denial of a confrontation? So first of all, the physical report, the piece of paper that was not in evidence, but the contents of the report as it was relevant to this case, that was testified to by this expert witness as the basis of as the basis of his opinion, correct? Yes, he based his opinion on what the actual analyst did. That's correct, Your Honor. And that was absolutely offered for the truth of the matter asserted. Testimony. If that wasn't for the truth of the matter asserted, it's unclear to me how any of the testimony would even be relevant. The reason that this testimony is relevant is because this underlying report is connected to the sweatshirt. Other and if it's not connected to the sweatshirt, if that true fact isn't coming in, and if the true the the findings of the of Mr. Burke, the original analyst upon which Mr. Rokowitz relied, if those facts aren't in evidence, then nothing Mr. Rokowitz had to say would be relevant. Now, isn't it also correct that Mr. Rokowitz testified that there was tampering with the evidence? I believe he testified that the notes indicated that there had, you know, a probable mix up between in the labeling of of the samples. So so that evidence should not have been admitted at all once there was any suggestion of tampering with the evidence. It's the state's responsibility to make sure that the evidence is not tampered with. So and I'm not sure if defense counsel even objected to any of that after the evidence of tampering came out. So now we're getting down another road, which I'm not sure we need to go down right now. But there's evidence Mr. Rokowitz testified to that, correct? Yes, your honor. And but that's just another reason why why we need because Burke's the one who was handling the evidence that came in. He was handling the kits. Burke can tell you what he did with them. Rokowitz can only tell you what Burke did with them. That's why it's hearsay. And because it's testimonial hearsay, there was a right to confront the witness. The actual witness was Burke. Just one general point. I think this touches on both of the primary issues I argued. The tie between the sweatshirt and the defendant in this case was proximity. I just want to be clear. He wasn't seen wearing it. He didn't confess. Well, unless he was the shooter, of course, but he wasn't seen wearing it at the time that he was identified. But he was wearing the pants, right? That's correct, your honor. He's wearing light color jeans. But as far as the sweatshirt goes, his DNA wasn't on it. He didn't confess ownership or anything like that. Nothing found on the sweatshirt and nothing found on the gun either. Right. That's right. There's no physical evidence directly tying my client to the gun, to the sweatshirt or to anything in this case. And this is a gun that was found in a different apartment from where the defendant was found. That's correct, your honor. And if the court does not have any more questions, we would ask it to reverse outright or alternatively to reverse and remand for a new trial. Okay. Thank you, Mr. Dow and Mr. Iskowitz for your excellence here today. And your mannerism is absolutely excellent. Both of you. We appreciate that very much. Thank you very much. This hearing is adjourned. Thank you.